**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**GULF POWER COMPANY,**

        **Plaintiff,**

v.                                              **Case No. 3:06cv270/MCR/MD**

**COALSALES II, L.L.C.**
**f/k/a/ PEABODY COALSALES COMPANY,**

        **Defendant**
_____/

## O R D E R

      In this diversity action, Plaintiff Gulf Power Company ("Gulf Power") sues Defendant Coalsales II, LLC ("Coalsales") for breach of a contract for the purchase and sale of coal. Presently before the court are Gulf Power's motion for partial summary judgment on the issue of liability (doc. 54) and Coalsales' motion for summary judgment on the ground that its obligations under the contract were excused by a *force majeure* event (doc. 86). Each party has filed a response to the other's motion, and a reply to the other's response.[1] For the reasons given below, the court GRANTS Gulf Power's motion and DENIES Coalsales' motion.

**Background**

      Gulf Power is a Florida corporation with its principal place of business in Pensacola, Florida. The corporation, an investor-owned electric utility serving the Northwest Florida

---

[1] (Docs. 62, 79, 94 and 102.)

Case No: 3:06cv270/MCR/MD

area, burns coal to generate electricity at Crist Plant (in Escambia County, Florida) and Smith Plant (in Bay County, Florida). Coalsales is a coal supplier which has furnished coal to Gulf Power since the 1970s. Coalsales is a Delaware limited liability company with its principal place of business in St. Louis, Missouri.

On May 12, 1994, Gulf Power and Coalsales' predecessor, Peabody Coalsales Company, entered into a Coal Supply Agreement ("CSA" or "1994 CSA") pursuant to which Coalsales agreed to provide Gulf Power with 1.9 million tons of coal annually until December 31, 2007.[2] The CSA defined three sources of coal to be supplied under the contract: Source A, the Paso Diablo Mine, located in the State of Zulia, Venezuela; Source B, the Galatia Mine, located in Saline County in the State of Illinois; and Source C, the Wells/Harris Complex, located in Boone County in the State of West Virginia. The CSA contained provisions requiring "test burns" of coal from Sources B and C prior to their approval. In addition, the CSA included provisions for the approval of other sources of coal. The record reflects that Source B and C, as well as several other sources of coal, were approved by Gulf Power and shipped by Coalsales during performance of the contract.[3] However, according to the CSA, the parties anticipated that the "primary source" of coal provided by Coalsales under the contract would be a blend of coal from Source A and Source B.[4]

---

[2] Throughout this order, the court refers to numbered "Sections" from this document. (*See* doc. 1-2). Before entering the CSA in 1994, the parties had entered into a previous Coal Supply Agreement in 1988 ("the 1988 CSA"). When the parties formed the CSA on May 12, 1994, they also agreed to terminate the 1988 CSA. Over the years Gulf Power also occasionally purchased coal from Coalsales pursuant to "spot" agreements. These agreements are not at issue in this litigation.

[3] Gulf Power claims, and Coalsales does not dispute, that Coalsales provided coal to Gulf Power from Source A (blended with Source B coal); Source B; Source C; Consolidated Coal Co., in Illinois; Perry County Coal, in Kentucky; Drummond InterOcean, in Colombia; Mount Owen, in Australia; West Elk Coal, in Colorado (blended with Source B coal); and Twentymile Coal, in Colorado (blended with Source B coal).

[4] In addition to the parties' express statements regarding the anticipated coal sources included in the CSA, some of the provisions were clearly drafted with Source A and Source B in mind; for example, a provision including specific instructions for shipping coal from Venezuela, the location of Source A. On the other hand, other provisions discuss multiple mines or sources, procedures for the approval of new sources, and abstract shipping terms which could be modified as needed to accommodate new sources. Because these provisions are hotly disputed by the parties, they are discussed in greater detail below.

On December 29, 1995, Gulf Power paid $22,000,000 to Coalsales as part of an agreement to amend the CSA to reduce the amount of coal from Source A that Gulf Power was required to purchase.[5] The parties amended the CSA again on or about January 15, 1998, and January 29, 2003. These amendments were part of a "market reopener" process, pursuant to Section 9.07 of the CSA, which gave Coalsales the right to extend the term of the contract at a renegotiated price.[6] The parties dispute whether the amended CSA established Source B, the Galatia Mine, as the sole source for coal supplied under the contract.[7] Coalsales describes the CSA, whether as initially drafted in 1994 or as amended in 1998 and 2003, as a "sole source" agreement which required Coalsales only to supply coal to Gulf Power from one - and only one - specific source, that being the Galatia Mine.[8] Gulf Power contends the CSA has never been treated as a sole source agreement and that since 1994 other sources for coal have been approved and supplied. It is undisputed that much of the coal supplied by Coalsales to Gulf Power under the CSA originated from Source B, the Galatia Mine. Beginning in 2003 Coalsales notified Gulf Power that, due to

---

[5] The parties dispute the purpose of the December 29, 1995 amendment. Coalsales claims Gulf Power wanted to eliminate Source A, the Paso Diablo Mine in the State of Zulia, Venezuela, as a source under the CSA, while Gulf Power claims that the purpose of the amendment was to buy down the contract quantity due to a significant decrease in the market price of coal. According to Coalsales, the 1995 amendment terminated all arrangements between the parties associated with Venezuelan coal. According to Gulf Power, although it withheld approval of Source A as a "stand alone" source after the 1995 amendment, it continued to approve of a blend of Source A coal, from Paso Diablo Mine, Venezuela, and Source B coal, from Galatia Mine, Illinois. However, whether Source A was entirely eliminated from the CSA or remained an approved source so long as it was blended with Source B coal is immaterial. Once the Source B coal from the Galatia Mine became unavailable, a fact neither party disputes, then the Source A coal could not be used as a substitute for Source B coal under either parties' interpretation of events. It is undisputed, however, that Source C remained an approved source under the contract.

[6] The CSA provides a complex procedure for setting the new price for the extended; however, the price-setting procedure is not at issue in this case. Rather, the parties' dispute centers on the amendments made during the renegotiation process.

[7] The amendments also modified several important provisions related to pricing and composition of the coal and allocation of risk; however, these provisions are not at issue here.

[8] The CSA refers to three coal sources, anticipates that Coalsales will provide a blend of coal from two of the three sources, specifically Source A and Source B, and provides for the approval of other sources. However, Coalsales characterizes these two sources, together, as the "sole" source of coal under the 1994 CSA prior to the amendments made during the market reopener process. As mentioned, after the market reopener process, Coalsales claims the sole source of coal was Source B, the Galatia Mine.

Case No. 3:06cv270/MCR

adverse geologic conditions at the Galatia Mine resulting in nonpermanent *force majeure* events, Coalsales would not be able to fully satisfy its tonnage requirements under the CSA.[9] As a result, between February 1, 2003, and May 31, 2006, Gulf Power experienced shortfalls of coal totaling 1,611,667 tons.[10] On January 23, 2006, Coalsales gave Gulf Power written notice of a permanent *force majeure* event at the Galatia Mine requiring the mine's closure. Coalsales took the position that the CSA named Galatia Mine as the sole source of the coal to be supplied to Gulf Power; therefore, in Coalsales' view, the mine's closure excused it from further performance of the CSA under the *force majeure* provisions in Section 14. Gulf Power countered that the CSA was not a sole source agreement; therefore it was unacceptable and improper for Coalsales to declare a *force majeure* based on difficulties at only one mine. According to Gulf Power, if coal was unavailable from the Galatia Mine, Coalsales was obligated by the CSA to supply coal from previously approved alternate sources.

The parties attempted unsuccessfully to negotiate a resolution. On June 21, 2006, Coalsales filed a complaint for declaratory relief in the United States District Court for the Southern District of Illinois; the following day Gulf Power filed the instant case in this forum, alleging that Coalsales was in breach of contract for failing to supply coal as set forth in the CSA. Coalsales moved to stay this case, pending a decision in the Illinois case on the applicability of the "first-filed" rule. The court granted Coalsales' motion to stay and denied

---

[9] Section 14.01 of the CSA defines "Force Majeure" as:

Any act, event or condition which has had a material adverse effect on the mining, loading, preparation, transloading or transporting of the coal by Seller or its Contractor(s) or the receiving, accepting, unloading, burning, utilizing, transloading or transporting of the coal by Buyer or Buyer's contractor which results in a partial or total curtailment of either party's fulfillment of any obligation or compliance with any condition hereunder if such act, event or condition is beyond the reasonable control of the party relying thereon as justification for not performing an obligation or complying with any conditions required of such party under this Agreement.

[10] Gulf Power also estimates shortfalls of 3,215,957 tons between June 1, 2006, and December 31, 2007. According to its complaint, Gulf Power has been damaged by Coalsales' failure to perform by having to purchase environmentally acceptable coal at market prices substantially higher than the prices called for under the CSA.

Case No. 3:06cv270/MCR

...


Page 5 of 14

as moot Coalsales' first motion to dismiss; denial was without prejudice to refiling at such time as the stay might be lifted. (Doc. 15.) Upon notice that the Illinois case had been dismissed, this court lifted its stay and Coalsales again moved to dismiss or, alternatively, to transfer the action.[11] The court denied Coalsales' motion. (Doc. 33.) The parties subsequently filed the pending motions.

**Discussion**

Both motions largely address the same issue: whether the adverse conditions at the Galatia Mine constituted a *force majeure* event under the CSA that excused Coalsales from its obligation to supply coal to Gulf Power.[12] A motion for summary judgment should be granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007). The court must avoid weighing contradictory evidence or making credibility determinations, *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000), and must draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Because the essential facts are not in dispute, the court's decision rests on the interpretation of the CSA.[13] The interpretation of an unambiguous contract is a matter of law. *See Lawyer Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995). In accord with the parties' choice of law, as set forth in the CSA, the court applies Florida law, including the Uniform Commercial Code ("UCC") as codified in the Florida Statutes.

---

[11] In Case No. 06-cv-488-DRH, United States District Judge David R. Herndon found that the United States District Court for the Southern District of Illinois had personal jurisdiction over Gulf Power and thus he denied Gulf Power's motion to dismiss on this ground. Judge Herndon also denied Gulf Power's alternate motion to transfer to this forum, instead addressing Coalsales' motion to establish its right to proceed in Illinois. Finding that Coalsales' declaratory judgment action was obviated by the instant breach of contract action, Judge Herndon dismissed Coalsales' case.

[12] Gulf Power's motion is for partial summary judgment on the issue of liability, because factual questions remain regarding the economic damage to Gulf Power from having to purchase cover coal. *See* Fed. R. Civ. P. 56(d)(2).

[13] The parties do not contest the problems at the Galatia Mine, or that Coalsales did not supply the full amount of coal provided for under the contract.

Case No. 3:06cv270/MCR

*See* Fla. Stat. ch. 672.[14] Because the CSA contains a merger clause designating it as the final expression of the parties' agreement, the court is precluded from considering evidence of any prior or contemporaneous agreements that may contradict it. *See* Fla. Stat. § 672.202. Furthermore, the court determines the parties' intent from the four corners of the contract, and only considers extrinsic evidence to explain or clarify ambiguous or unclear language, none of which is present in the CSA.[15] *See Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009); *Ospina-Baraya v. Heiligers*, 909 So. 2d 465, 472 (Fla. 4th DCA 2005). The court gives a realistic, plain-language meaning to the words of the contract, and construes the contract as a whole, giving effect to all its provisions, in a manner which accords with reason and probability. *See Taylor*, 1 So. 3d at 350, *Ospina-Baraya*, 909 So. 2d at 472. Whenever reasonable, the court construes the express terms of the contract to be consistent with any course of performance, course of dealing or usage of trade. *See* Fla. Stat. § 672.208. However, when such a construction is unreasonable, the express terms of the contract shall control. *Id.*

The 1994 CSA

Gulf Power alleges that Coalsales' breach of the contract began in February 2003, after the amendments to the CSA that occurred in 1995, 1998 and 2003.[16] However, in light of the complexity of the CSA and its subsequent amendments, and the parties' history of dealing and performance, the court first considers the CSA when it was initially drafted, in 1994.[17] *See* Fla. Stat. § 672.208. Gulf Power claims the 1994 CSA clearly obligated

---

[14] *See also Weyher/Livsey Constructors, Inc., v. Int'l Chem. Co.*, 864 F.2d 130, 132 (11th Cir. 1989) (in a diversity case, applying Texas's codification of the UCC to a contract for the sale of coal); *Paul Gottlieb & Co., Inc. v. Alps So. Corp.*, 985 So. 2d 1, 5 (Fla. 2nd DCA 2007) (applying Florida's codification of the UCC).

[15] The court agrees with the parties that the CSA is unambiguous.

[16] The parties entered the latest amendment on either December 5, 2002, according to Coalsales, or January 29, 2003, according to Gulf Power, but in any event before February 1, 2003, when Gulf Power first alleged shortfalls under the CSA.

[17] The court considers the effects of the amendments below.

Case No. 3:06cv270/MCR

Coalsales to provide it with 1.9 million tons of specific quality coal annually.[18] Coalsales claims the 1994 CSA obligated it only to supply a blend of coal from Source A, the Paso Diablo Mine in Venezuela, and Source B, the Galatia Mine in Illinois. Gulf Power argues that the CSA explicitly designates three pre-approved sources of coal, and provides procedures for the establishment of other sources of coal.[19] To further bolster its position, Gulf Power argues that Section 7.01, "Coal Specifications," which states: "If during the term of this Agreement, [Coalsales] is required to supply coal from a Source other than A, B and/or C, the minimum rejection limits for Ash and Btu will be as follows. . . ." is inconsistent with a sole source agreement.

Coalsales provides a variety of counter-arguments, all of which the court rejects. First, Coalsales repeatedly refers to extrinsic and parol evidence of the parties' intent in forming the 1994 CSA, which, as noted, the court is precluded from considering.[20] *See Taylor*, 1 So. 3d at 350; *Ospina-Baraya*, 909 So. 2d at 472. Despite acknowledging that the CSA is unambiguous, Coalsales never attempts to justify its use of extrinsic evidence. Next, Coalsales claims that thirty-two provisions in the 1994 CSA dictate the protocol for shipping the blend of Source A and Source B coal, thus, according to Coalsales, interpreting the contract as anything other than a single source agreement would render

---

[18] The first provision of the CSA, Section 1.01," Mutual Obligations," provides: "Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase and accept from Seller coal of the quantity and quality, at the price, and subject to the applicable terms and conditions hereinafter set forth." Gulf Power also refers to Section 6.02, "Annual Quality," which provides, in part: "Except as otherwise provided, Seller shall supply to Buyer and Buyer shall purchase from Seller under the terms of this Coal Supply Agreement 1,900,000 Tons of coal per Year...."

[19] Section 2.30 defines "Source" to mean the following mines from which the coal is produced: Source A, the Paso Diablo Mine, State of Zulia, Venezuela; Source B, the Galatia Mine, Saline County, State of Illinois; and Source C, the Wells/Harris Complex, Boone County, State of West Virginia. Furthermore, Section 6.05, "Other Sources," states that Coalsales could supply "the coal to be supplied hereunder" from Source B or Source C. Thus, "the coal to be supplied" under the CSA was not restricted to the blend of Source A and Source B coal.

[20] Although Coalsales states that the CSA is unambiguous, it continuously improperly relies on extrinsic and parol evidence, in the form of depositions, declarations and letter records of contemporaneous negotiations, to support Coalsales' interpretation of the contract throughout its briefs. The parties to the CSA were sophisticated business entities, represented by counsel, with significant knowledge of the purchase and sale of coal; there can be no doubt they were capable of clearly and unambiguously stating their intentions within the contract.

Case No. 3:06cv270/MCR

these provisions meaningless.[21] Gulf Power argues the provisions are consistent with its multi-source interpretation of the contract. Contrary to Coalsales' position, many of the provisions referenced by Coalsales make no reference to Source A or Source B, and several others directly contradict Coalsales' sole source interpretation.[22] Of the thirty-two provisions referenced by Coalsales, only six seem to support Coalsales' position: Sections 2.05, 5.02, and 9.01; Section 5.08; and Sections 6.02 and 7.02. Coalsales argues that Sections 2.05, 5.02 and 9.01, describe pricing, risk of loss and transfer of title only for coal from Source A and B. According to Coalsales, because the terms of these Sections make no provision for, or reference to, alternate sources of coal, the CSA would be meaningless if it were not a single source agreement. In response, Gulf Power argues that Section 6.05, which refers to Section 9.01, established the price of other sources of coal as the price of the blend of Source A and Source B coal. However, the court need not find that the CSA provided a price for other sources of coal, as the law plainly allows parties to a contract to decide on open terms, including open pricing. *See* Fla. Stat. §§ 672.204(3), 672.305 (codifying U.C.C. §§ 2-204(3), 2-305); *see also Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849, 854 (11th Cir. 1997); *Giacalone v. Helen Ellis Mem'l Hosp. Found., Inc.*, 8 So. 3d 1232, 1232 (Fla. 2nd DCA 2009). Coalsales also notes that Section 5.08 provides detailed shipping instructions that, based on their reference to Lake Maracaibo, Venezuela, seem to be intended for coal from Source A, the Paso Diablo Mine, also in Venezuela.

---

[21] Coalsales identifies these thirty-two provisions as Sections 2.05, 2.06, 2.07, 2.10, 2.12, 2.16, 2.20, 2.22, 2.23, 2.27, 2.28, 2.30, 2.34, 5.02, 5.03, 5.08, 6.02, 6.04, 6.05, 7.01, 7.02, 8.01, 8.02, 9.01, 9.04, 9.06, 9.07, 11.01, 14.02, 14.06, 15.01, and 19.01.

[22] Of the sections Coalsales refers to, Sections 2.06, 2.07, 2.10, 2.12, 2.16, 2.20, 2.27, 2.28, 2.34, 5.03, 8.01, 8.02, 9.04, 9.06, 11.01, 14.02, 14.03, 14.06 and 19.01 do not mention Source A or Source B. Coalsales also refers to Sections 6.04, which describes Source C, and 6.05, which describes "other sources," as support for its sole source interpretation. Finally, Coalsales refers to Sections 2.22, 2.23, 2.30, 6.02, 7.01, 7.02, 9.07 and15.01, which either mention sources other than Source A and Source B directly or refer to Sections 6.04 and 6.05. As noted above, Section 7.01 raises the possibility of Coalsales being "required to supply coal from a Source other than A, B and/ or C." Furthermore, the level of abstraction of the terms of the contract support a finding that the parties intended for the contract to be flexible with regard not only to the source of the coal but to other terms, such as shipping points. For example, Section 11.01 contains a billing formula which refers to a number of terms, such as the Outbound Loading Point, which are variable rather than fixed.

Case No. 3:06cv270/MCR

Although specific to Source A, the shipping instructions in Section 5.08 do not exclude the possibility of other sources of coal. If specific shipping instructions for Source A coal excluded other sources of coal, then they would also exclude Source B coal, which Coalsales was obligated to supply even under its own interpretation of the contract. Because the parties anticipated that the coal would be supplied primarily from Sources A and B, it's reasonable to expect that the agreement would provide the most detail regarding coal from those sources. However, the presence in the contract of greater detail regarding particular sources does not preclude other sources, nor does it detract from the plain language obligating Coalsales to supply coal.

Finally, Coalsales argues Sections 6.02 and 7.02 indicate that the parties "anticipated" Coalsales would supply a blend of coal from Source A and Source B.[23] The court finds that, while this language reflects the parties' anticipation that the entire 1,900,000 tons would come from Sources A and B, it does not reflect the parties' intent to *limit* Coalsales' obligation to supply coal to only those two sources. Indeed, both sections explicitly refer to other approved sources of coal. Thus, the court rejects Coalsales' argument that the provisions of the contract would be meaningless if the CSA were not a sole source agreement.[24]

Coalsales further argues that it had the right, but not the obligation, to supply coal to Gulf Power from other approved sources. Section 6.04 provides, in relevant part: "[Coalsales] shall have the right to supply the coal to be delivered hereunder from the Paso Diablo Mine, (Source A), State of Zulia, Venezuela; the Galatia Mine, (Source B), Saline County, State of Illinois; or other Source(s) approved by Buyer, which approval shall not be unreasonably withheld." Gulf Power argues that, had the parties intended for Coalsales

---

[23] Section 6.02 provides, in relevant part: "It is anticipated that the approximate Annual Quality under this Agreement from Source A (Section 6.04) will be 1,000,000 Tons and from Source B (Section 6.04) 900,000 tons." Similarly, Section 7.02 provides, in relevant part: "It is anticipated that the *primary* source of coal under this Agreement shall be a blend of coals from Source A and Source B." (emphasis added).

[24] Moreover, the court agrees with Gulf Power that it would defy common sense for a sole source agreement to contain provisions, such as Section 7.01, contemplating a party being required to supply coal from other sources. *See Ospina-Baraya*, 909 So. 2d at 472 (stating courts should interpret contracts to give effect to every provision).

Case No. 3:06cv270/MCR

to have "the right, but not the obligation," to substitute sources of coal, then the parties would have used that exact language, as the parties did in other provisions of the CSA.[25] Coalsales argues, and the court agrees, that a reference in the contract to a right, without the phrase "but not the obligation," does not necessarily confer an obligation. Neither does the word "right," without more, *negate* an obligation already existing under the contract, however. Coalsales argues further that Gulf Power cannot point to a provision in the CSA requiring Coalsales to supply coal from Source C or seek approval from other sources. However, the absence of an obligation to provide coal from a particular source is entirely consistent with Gulf Power's position that Coalsales had an obligation to supply coal, but could choose between the approved sources.[26] The right to choose between the approved sources did not give Coalsales the right to refuse to supply coal at all, when only one of the approved sources became unavailable.

Coalsales also relies on Section 6.02, which provides, in relevant part: "If Seller elects to ship Source B and/or Source C tons," and on Section 6.05, which provides Coalsales with the right to defer a test burn of Source C. Again, Coalsales' right to determine the specifics of its performance does not eliminate its obligation to perform under the contract. Thus, the court finds that under the 1994 CSA Coalsales' obligation to supply coal was not limited to a single source.

<u>The Market Reopener Amendments</u>

Having determined that the 1994 CSA expressly contemplated multiple sources of

---

[25] For example, Sections 9.04(4) ("Buyer shall have the right, but not the obligation, to terminate this CSA. . . .") and 15.01 ("Seller shall have the right, but not the obligation" to supply coal with changed quality specifications in response to changed environmental-related requirements, which are not at issue in this case).

[26] Coalsales relies on the "common sense" distinction between a right and an obligation; according to Coalsales, its position is that "Circle [right] = Circle [right]," while Gulf Power's position is that "Circle [right] = Square [obligation]." (Doc. 62-2 at 20.) The court accepts Coalsales' invitation to apply Boolean logic to the issue at hand, specifically the "or" logical operator. The obligation to do (either A or B) is not logically equivalent to an obligation to do A, because the obligation may be satisfied by doing B. Thus, just because there is no obligation to do A does not mean there is no obligation to do (either A or B). However, if it becomes impossible to do B, then the obligation to do (either A or B) may only be met by doing A. Furthermore, under De Morgan's laws, doing (either A or B) is only impossible if doing A is impossible *and* doing B is impossible. *See* STAN GIBILISCO & NORMAN H. CROWHURST, MASTERING TECHNICAL MATHEMATICS 422 (3d ed. 2007).

coal, the court will consider whether, as Coalsales suggests, during the "market reopener" process, the parties amended the CSA to a single source agreement.[27] Section 9.07 provided a procedure for periodic price renegotiation, referred to by the parties as "market reopeners." The procedure provided that, in 1997 and 2002, at the direction of either party, Gulf Power would use a bidding process to determine the new market price of the coal to be supplied under the contract. Coalsales had the right to either allow the contract to expire or to accept the new market price; if Coalsales accepted the new price, the contract would continue. Accordingly, on November 11, 1997, and October 31, 2002, Gulf Power provided Coalsales with a new market price. On December 8, 1997, and December 5, 2002, Coalsales mailed letters which, in addition to accepting the new price, notified Gulf Power that "the entire 1.9 million tons will be supplied from [the] Galatia Mine, subject to substitution rights contained in the Agreement."[28] (*See* docs. 87-11, 87-17). Further, the letters concluded: "If the foregoing meets your approval, an appropriate amendment to the Agreement will be prepared and executed by the parties." *Id.* On January 15, 1998 and January 29, 2003, the parties both signed agreements which expressly amended the CSA. Instead of the language from the letters referring to Galatia Mine as the source for the "entire 1.9 million tons," the two agreements stated: "The Primary Source of Deliveries contemplated under this [a]mendment will be the . . . Galatia Mine."[29]

Coalsales argues that the letters had the effect of continuing the contract, which Gulf Power does not dispute, and altering the contract's terms, which Gulf Power disputes. Gulf Power states that Section 28.01 of the CSA requires any amendments to the contract to be evidenced by an agreement in writing, and notes that the parties amended the CSA by

---

[27] As noted above, the parties also amended the agreement in 1995; this amendment has not been discussed by the parties so the court does not discuss it here.

[28] The court analyzes the two letters together because they contain identical language on the disputed issue, as do the two agreements.

[29] There are minor inconsequential differences between the two amendments. The omission in the quoted text reflects a change in the Galatia Mine's ownership; in 1998, it was owned by Kerr-McGee Coal Corporation, but in 2003, it was owned by American Coal Company. In addition, the 1998 amendment does not capitalize the word "amendment," but the 2003 agreement does.

Case No. 3:06cv270/MCR

agreement on January 15, 1998 and January 29, 2003.. Coalsales provides no support for its claim that the right to extend the term of a contract pursuant to Section 9.07 carried with it the right to unilaterally modify its terms without the agreement of the other party. Thus, while Coalsales' letters did not amend the contract, the 1998 and 2003 agreements did. However, Coalsales argues in the alternative that the 1998 and 2003 agreements, which designate the Galatia Mine as the "Primary Source," have the effect of naming Galatia Mine as the sole source under the contract.[30] Gulf Power argues, and the court agrees, that "primary" does not, in fact, mean "sole," particularly in light of the course of dealing and performance of the parties under the CSA, including Coalsales' supply of coal from multiple sources other than the Galatia Mine. Gulf Power also argues that, in the absence of express limiting language, the court must conclude that the parties did not enter into a sole source agreement, citing *Orion Power Midwest v. American Coal Sales Co.*, 2008 WL 2185008 at *2 (W.D. Pa. May 22, 2008) (unpublished). The court in *Orion Power Midwest* faced a facially similar breach of contract action in which the plaintiff alleged that the defendant was obligated to provide coal from an alternative source when an event of *force majeure* closed a mine. *Id.* The defendant moved for summary judgment on the ground that the coal contract was a sole source contract. *Id.* at *1. The court noted that the contract, which contained no express limiting language, contained several provisions inconsistent with a sole source interpretation of the contract. *Id.* at *2. Additionally, the contract in that case defined *force majeure* in a manner that could require the defendant to provide coal from an alternate source, despite other indications that it was a sole source contract. *Id.* at *1. Because no explicitly limiting language appeared in the contract and the parties each presented conflicting but reasonable interpretations, the court could not conclude as a matter of law that the parties intended to enter a sole source contract. *Id.* at *2 Here, the contract at issue is not susceptible to two conflicting reasonable interpretations. To the contrary, it explicitly identified three sources and made provisions

---

[30] Coalsales also argues that the 1998 and 2003 agreements incorporate the terms of the letters, based on language preceding the agreement to amend stating that the parties were amending the CSA "in accordance with" the 1997 and 2002 letters. The court cannot infer from this preface the parties' intent to incorporate language into the agreements which differs from the agreements' express unambiguous terms.

Case No. 3:06cv270/MCR

for other approved sources as well. Due to the factual and postural differences, the court does not rely on *Orion Power Midwest*. However, based on the plain, unambiguous language of the CSA as amended during the market reopeners, the court finds that the CSA was not a sole source agreement.[31]

The *Force Majeure* Clause

The CSA excuses nonperformance of an obligation when it is the result of an adverse event outside of the party's control.[32] The parties agree that there were adverse conditions at the Galatia mine and that those conditions were not within the control of Coalsales. However, because other mines were approved and available to Coalsales, the court finds Coalsales failure to meet its obligations to Gulf Power was not the result of the conditions at Galatia Mine. Gulf Power has alleged, and Coalsales has not disputed, that coal was readily available to Coalsales from other approved sources, including Source C, the Wells/Harris Complex, located in West Virginia. Therefore, Coalsales' nonperformance is not excused by the *force majeure* clause.

**Conclusion**

The court finds that the 1994 CSA unambiguously obligated Coalsales to supply Gulf Power with coal from any of several approved sources. The 1998 and 2003 amendments the parties entered to during the "market reopener" process did not limit Coalsales obligation to providing coal to a single source. Because Coalsales obligation to provide coal was not limited to a single source, the closure of Source B, the Galatia Mine, did not

---

[31] Finally, Coalsales argues that, because Gulf Power used the phrase "sole primary source of supply" to describe a mine in the parties' 1988 termination agreement, "sole" and "primary" are synonymous. *(See* doc. 87-4 at page 2). The court does not find the terms synonymous. Notwithstanding, the court notes the *absence* of the word "sole" from the CSA when the parties designated Source B as the primary source. The parties past dealings indicate that, had they desired to describe Source B as the "sole primary" source, they could have.

[32] Coalsales argues that the *force majeure* clause is rendered meaningless by a multi-source interpretation of the contract. Gulf Power argues, and the court agrees, that the *force majeure* has meaning: under the plain language of the contract, Coalsales' performance would be totally excused if *all* approved sources of coal were unavailable to Coalsales. It is undisputed that Source C was an approved source of coal available to Coalsales. Similarly, the unavailability of some portion of the approved sources would cause a partial curtailment of Coalsales' obligation, excusing Coalsales' performance for the time and to the extent it needed to make arrangements to substitute coal from the other approved sources.

Case No. 3:06cv270/MCR

constitute a *force majeure* event under the CSA which freed Coalsales of its obligations. Thus, the court finds that Coalsales breached the CSA by failing to supply the agreed upon amount of coal to Gulf Power.

Accordingly, it is ORDERED:

1. Gulf Power's Motion for Partial Summary Judgment (doc. 54) is GRANTED.

2. Coalsales' Motion for Summary Judgment (doc. 86) is DENIED.

DONE and ORDERED this 30th day of September, 2009.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**