# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**GULF POWER COMPANY,**

    Plaintiff,

v.                                          Case No. 3:06cv270/MCR/MD

**COALSALES II, L.L.C. f/k/a**
**PEABODY COALSALES COMPANY,**

    Defendant.
_____/

## **ORDER**

        Gulf Power Company ("Gulf Power") sued Coalsales II, LLC ("Coalsales") for breach of a multi-year coal supply agreement ("CSA"), seeking to recover $77,465,211 in damages it allegedly incurred after it was forced to purchase substitute coal to make up for deficiencies in the amount of coal Coalsales was obligated to supply under the CSA. On September 30, 2009, the court granted Gulf Power's motion for partial summary judgment on liability (doc. 112). The issue of Gulf Power's damages was tried to the court without a jury from February 9, 2010, to February 17, 2010. Following trial, the court entered an order setting forth its findings of fact and conclusions of law, ultimately ruling that Gulf Power's cover purchases were not reasonable and that Gulf Power, therefore, failed to prove its damages claim (doc. 171). Gulf Power filed a Motion to Alter or Amend Judgment, or, Alternatively, for Relief from Judgment (doc 177), arguing that the court's findings were based on mistakes of fact and law.[1] Although Gulf Power did not concede that any of its cover purchases were unreasonable, it urged the court to reconsider its

---

[1] Specifically, Coalsales argued that the court misconstrued the sulfur values set forth in two documents and failed to appreciate the quantity of one of its 2007 cover purchases. Gulf Power also challenged the court's finding that it purchased lower sulfur coal when higher sulfur coal was available and argued that the court erred in failing to properly apply § 672.712 because it did not address expenses saved in connection with Gulf Power's claim for cover damages.

reasonableness finding with respect to its 2007 cover purchases and, at a minimum, award it damages based on those purchases.  After conducting another review of Gulf Power's 2007 cover purchases, the court found that it committed a manifest error of fact in failing to appreciate the quantity of one of the two cover coals Gulf Power purchased in 2007 and that such error seriously impacted the court's analysis with respect to the reasonableness of Gulf Power's 2007 cover purchases.  The court thus granted Gulf Power's motion and, considering the correct quantity and quality of cover coal purchased by Gulf Power in 2007, found that the cover purchases were reasonable and that Gulf Power should be afforded an opportunity to prove its damages based on that cover.  Accordingly, the court conducted an evidentiary hearing on August 25, 2011, on the issue of Gulf Power's 2007 cover damages.

As set forth in the court's findings of fact and conclusions of law, Coalsales was obligated under the CSA to supply Gulf Power with 1.9 million tons of coal in 2007, to be delivered F.O.B. Barge at a billing price of $34.11 per ton.[2]  The coal was to have a minimum heat value of 12,000 Btus per lb. and a maximum sulfur dioxide ("SO2") content of 1.7 lbs. per MMBtu.[3]  Coalsales designated the Galatia Mine, which was owned by The American Coal Company ("AmCoal"), as the primary source from which the coal would be provided and the McDuffie Terminal at the Alabama State Docks as the delivery point.[4]  Beginning in 2003, AmCoal encountered geologic conditions at the Millennium Portal of the Galatia Mine that rendered mining there unreasonably dangerous.  AmCoal thus was

---

[2] That price was derived from a delivered price of 1.5197 lbs. per MMBtu, which the court previously found applies to all coal delivered under the CSA.

[3] "Btu" is an abbreviation for "British thermal unit," which refers to the amount of heat required to raise the temperature of one pound of water by one degree Fahrenheit, equivalent to approximately 1055 joules. "Btu" is used in the power industry to describe the heat value of coal.  MMBtu represents one thousand Btus. The court also would note that the parties and the contracts at issue in this matter refer to both the sulfur and the SO2 content of coal.  For purposes of consistency, the court will refer to the SO2 content of coal throughout the remainder of this order.

[4] The majority of the coal shipped under the CSA came from the Millennium Portal of the Galatia Mine.  A coal mine may have multiple portals which, in turn, may affect the characteristics of the coal produced.  The Galatia Mine contained at least three portals – the Millennium Portal, the North Portal, and the Number 6 Portal.

unable to provide Coalsales with enough coal to permit Coalsales to fulfill its supply obligation under the CSA. On January 23, 2006, Coalsales gave Gulf Power written notice of a permanent *force majeure* and closure of the Millennium Portal.[5] The parties attempted to negotiate an alternative source of coal to be delivered under the CSA, but their negotiations failed. Coalsales thereafter ceased performing under the CSA.[6]

Under Florida law, a buyer has two options when a seller repudiates a contract or wrongfully fails to deliver goods – it may make in good faith and without unreasonable delay a reasonable purchase of substitute goods, referred to as "cover," or it may recover damages for non-delivery. *See* Fla. Stat. §§ 672.711(1)(a), 672.712(1), and 672.713(1). In this case, Gulf Power elected to procure substitute coal to make up for the coal Coalsales failed to provide under the CSA. It did so under two purchase agreements – one with AmCoal and the other with Interocean Coal Sales, LDC ("Interocean"). Pursuant to its contract with Gulf Power, AmCoal was to supply Gulf Power with 1,200,000 tons of North Portal coal in 2007 at a price of $47.81 per ton. The coal was to have a minimum heat value of 12,000 Btus per lb. and a maximum SO2 content of 2.5 lbs. per MMBtu. Unlike the CSA, Gulf Power's contract with AmCoal included a provision requiring Gulf Power to pay AmCoal a premium in the event AmCoal delivered coal under the contract having an SO2 content less than the maximum specified in the contract. The AmCoal contract also contained a dock charge. Although the CSA provided for delivery F.O.B. barge at the McDuffie terminal, the AmCoal agreement provided for delivery F.O.B. the dock, which meant that Gulf Power was responsible for the cost of having the coal loaded

---

[5] The CSA contained a *force majeure* provision, excusing Coalsales from performance in the event of certain circumstances beyond its control, including any event or condition having a material adverse effect on the mining of the coal by the seller or its contractor. Coalsales declared *force majeures* under the CSA in September, October, and November 2003; in June, August (twice), and December 2004; in January, September (twice), October, November, and December 2005; and in January 2006. The parties did not dispute that the geologic conditions at the Galatia Mine during the relevant time frames constituted *force majeure* events.

[6] Coalsales took the position in this litigation that the CSA was a single source contract and that the permanent *force majeure* excused it from performance under the CSA. The court disagreed with Coalsales' position in that regard and determined at the summary judgment stage that Coalsales' failure to ship coal from other sources constituted a breach of the CSA (doc. 112).

Case No. 3:06cv270/MCR/MD

from the dock onto its barge. As a result, Gulf Power entered into a contract with the Alabama State Port Authority to perform those services for $1.96 per ton of coal.

In addition to the AmCoal contract, Gulf Power entered into a contract with Interocean Coal Sales, LDC ("Interocean") for the purchase of 1,125,000 tons of Columbian coal to be delivered in 2007. The Interocean coal was to have a heat value of 11,500 Btus per lb. and a maximum SO2 content of 1.22 lbs. per MMBtu. It was to be delivered F.O.B. barge at a price of $61.88 per ton.[7] Gulf Power's contract with Interocean also contained a provision requiring Gulf Power to pay a premium in the event Interocean delivered coal having an SO2 content less than that specified in the contract.

Although Coalsales declared a permanent *force majeure* under the CSA due to conditions at the Galatia mine, AmCoal was able to provide Coalsales with additional coal in 2007. Coalsales thus informed Gulf Power that the *force majeure* was not permanent and delivered close to 800,000 tons of coal under the CSA that year. As a result, Gulf Power procured only 1,123,889 tons of cover coal in 2007.[8] As was the case with the CSA, the cover coal was intended for two of Gulf Power's plants – Plant Crist, located in Escambia County, Florida, and Plant Smith, located in Bay County, Florida. According to air permit requirements, Plant Crist could not burn coal with an SO2 content higher than 2.4 lbs. per MMbtu and Plant Smith could not burn coal with an SO2 content higher than 2.1 lbs. per MMbtu. Because the AmCoal agreement provided for coal having an SO2 content in excess of the plants' limits, Gulf Power blended the AmCoal and Interocean coals in *equal* quantities to achieve an SO2 content within the limitations of the air permit. For purposes of establishing its damages at trial, Gulf Power relied on the average contract price for the two cover coals, with adjustments made to account for the lower heat value

---

[7] Because the Interocean coal had a heat value of 11,500 Btus per lb., as opposed to the 12,000 Btus per lb. specified in the CSA, Coalsales did not dispute that, for purposes of determining Gulf Power's damages, the contract price for the Interocean coal should be adjusted to $64.57 per ton to account for the difference in heat value.

[8] Based on the evidence at trial, the court found that Gulf Power properly designated its cover purchases. As a result, neither the amount of those purchases nor their base contract price was in dispute at the recent hearing.

of the Interocean coal and the dock charge Gulf Power was required to pay in connection with the AmCoal contract.[9]  Based on that price, as well as the CSA price and quantity of cover coal purchased, Gulf Power argued that it paid $20,527,789 more for the cover coal than it would have paid for the same quantity of coal under the CSA.

Although, at the hearing, Coalsales did not dispute the amount or average base contract price of Gulf Power's 2007 cover purchases, it argued that Gulf Power is not entitled to an adjustment to the base contract price to account for the dock charge because Gulf Power did not offer evidence of the dock charge at trial.[10]  Coalsales is mistaken in that regard.  Indeed, Coalsales offered into evidence at trial a document prepared by Russell Ball, Gulf Power's fuel manager, setting forth Gulf Power's damages calculation, which included the adjusted average contract price of Gulf Power's 2007 cover purchases. Although that document did not reference the dock charge, according to Ball, the dock charge was included as a component of the adjusted average contract price.  Coalsales thus was in possession of at least one document from which it could have deduced each component of the adjusted average contract price, including the dock charge.  The fact that Coalsales did not do so does not preclude Gulf Power from recovering that expense. Based on the evidence at the hearing, the court finds that Gulf Power is entitled to recover the dock charge as part of its 2007 cover damages.  *See* Fla. Stat. §§ 672.712, 672.715. The court also finds from the evidence that Gulf Power paid $20,527,789 more for the 2007 cover coal than it would have paid for the same quantity of coal under the CSA and that Gulf Power is entitled to a judgment in that amount.

Gulf Power also argued at the hearing that, in seeking only $20,527,789 for its 2007 cover purchases, it underestimated its damages at trial by $1,119,889.75.  Seth Schwartz, Gulf Power's expert witness, testified during the damages hearing that, in order to

---

[9] Gulf Power also relied on the average SO2 content of the cover coals.  Coalsales never objected to Gulf Power's methodology in that regard.

[10] According to Coalsales, it had no knowledge of the alleged dock charge until the afternoon before the hearing.

accurately compute Gulf Power's damages, the court should calculate the price Gulf Power paid for the cover coal based on the specifications set forth in the CSA.  In other words, according to Schwartz, Gulf Power should be compensated for the fact that the average SO2 content of the coal specified in Gulf Power's cover contracts was .16 lbs. per MMBtu higher than the SO2 content specified in the CSA.  There are a number of problems with Gulf Power's position in that regard.  First, as Coalsales pointed out, Gulf Power argued at trial that the SO2 content of its 2007 cover coal was equivalent to that specified in the CSA, and Gulf Power did not seek damages based on the SO2 differential.[11]  As a result, Coalsales had no notice that Gulf Power would seek such damages at the damages hearing and thus did not have a sufficient opportunity to defend against the claim.  Second, although Gulf Power adjusted its damages calculation to account for the higher average SO2 content specified in its cover contracts, it did not make a corresponding adjustment in the price set forth in those contracts despite undisputed evidence at trial regarding the increased cost of lower SO2 coal.[12]  Finally, although the average guaranteed maximum SO2 content specified in Gulf Power's cover contracts was higher than the guaranteed maximum SO2 content specified in the CSA, the coal delivered under the cover contracts had an average SO2 content considerably less than the SO2 content specified in the CSA. Indeed, according to Schwartz, the combined SO2 content of the cover coal was 1.38 lbs. per MMBtu.  As a result, Gulf Power would not have been required to surrender any additional SO2 emissions allowances to burn the cover coal.  The court thus finds that Gulf

---

[11] Ball testified at the hearing that he did not focus at trial on the difference between the SO2 content specified in Gulf Power's cover contracts and the SO2 content specified in the CSA because the CSA did not provide for a sulfur premium.

[12] As explained in the court's previous orders, when coal is burned, the sulfur combines with oxygen, producing SO2.  State environmental agencies issue permits to utility companies that limit the amount of SO2 they may emit at their generating plants.   Utility companies receive a certain number of SO2 emissions allowances each year based on their allowed emissions and, at least during the time period at issue, were required to surrender one emissions allowance for each ton of SO2 emitted.  There is a market on which SO2 emissions allowances are traded at variable – and, at least at times, very significant – prices.  If a utility company emits more SO2 in a year than permitted under its allowable emissions, it must surrender additional allowances.  Lower sulfur coal is desirable because it results in fewer SO2 emissions when burned.  Sulfur content is thus a huge factor in the purchase and pricing of coal in the United States.

Power is not entitled to recover damages based on the difference in the SO2 content specified under the cover contracts and the CSA.

Having determined Gulf Power's damages as a result of Coalsales' breach, the court must now consider whether Gulf Power saved any expenses as a result of its 2007 cover purchases.[13]  Although Gulf Power acknowledged that it received cover coal having an SO2 content less than what was specified in the CSA, it insisted that it saved no expenses as a result of the lower SO2 cover coal because it was required to pay AmCoal a premium equal to the amount it saved in SO2 emissions allowances as a result of the lower SO2 coal.  Coalsales did not dispute that Gulf Power was required to pay a premium for lower SO2 coal or that the premium would have offset any benefit Gulf Power received from the lower SO2 content of the cover coal.  Rather, Coalsales argued that Gulf Power failed to prove that it actually paid an SO2 premium.  As Coalsales points out, Gulf Power did not produce a receipt or other document evidencing such a payment.  Although Coalsales is correct that Gulf Power did not present documentary evidence of its payment of the SO2 premium, Ball testified that Gulf Power complied with all of its contractual obligations to AmCoal and paid AmCoal a premium for the lower SO2 coal according to the formula set forth in the parties' agreement.[14]  According to Ball, as fuel manager for Gulf Power, he would have known if Gulf Power had not paid AmCoal the SO2 premium due under the contract, and no one ever indicated to him that it had not been paid. Particularly considering the absence of any evidence to the contrary, the court credits the testimony of Ball and Schwartz and finds that Gulf Power demonstrated by a preponderance of the evidence that it  paid a premium for the lower SO2 coal and that the

---

[13] In its prior order, the court found that expenses saved is an element of Gulf Power's damages claim on which Gulf Power bears the burden of proof and that Gulf Power is required to deduct from its damages claim any expenses it saved as a result of its cover purchases.

[14] Schwartz also testified that, assuming Gulf Power complied with its contractual obligations to AmCoal, any savings it realized as a result of AmCoal's delivery of coal having an SO2 content less than that specified in the parties' agreement "would have been exactly offset using the exact same calculation by the additional payments Gulf Power would have made to the cover contract suppliers to buy that lower sulfur coal that was actually delivered under the contract."

premium was approximately equal to the market value of the SO2 emissions allowances Gulf Power was not required to surrender as a result of the low-SO2 coal, thereby offsetting any benefit Gulf Power received.  *See Telecom Technical Services Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004) (noting that the best evidence rule applies only "where the party presenting evidence seeks to prove the specific contents of a writing" and that when a party is seeking to prove a fact other than the terms of a contract, testimony will suffice).  Gulf Power thus saved no expenses in connection with the lower SO2 content of the cover coal.

In addition to the lower SO2 content, Coalsales argued that the cover coal had a lower chlorine content than what was specified in the CSA, which reduced Gulf Power's operations and maintenance costs.[15]  In support of its position, Coalsales introduced deposition testimony at the damages hearing of two of Gulf Power's employees that high-chlorine coal causes corrosion in Gulf Power's boilers, resulting in increased operations and maintenance costs.  Although Coalsales offered evidence that high-chlorine coal causes corrosion, Ball testified that Gulf Power's plants were designed to burn coal with a high chlorine content.  Ball also testified that he consulted Gulf Power's plant managers, operations managers, and senior production manager about their experiences with high-chlorine coal and that not one of them was aware of any impact on operations and maintenance costs attributable to chlorine.  Vick similarly testified that he was aware of no economic costs associated with high-chlorine coal.  Even assuming Gulf Power benefitted from the lower chlorine content of the cover coal, there was no evidence that those benefits can be quantified.  Tris Swindle, one of Gulf Power's coal buyers, testified in his deposition that savings associated with low chlorine coal can be calculated; he also testified, however, that he does not know how to perform that calculation.  Ball likewise testified that he does not know how to measure benefits associated with low-chlorine coal and that none of the individuals with whom he spoke was aware of any method for doing so.  And Coalsales

---

[15] According to James Vick, Gulf Power's manager of environmental affairs, the chlorine content of Galatian coal is ten times that of import coal.

offered no evidence to the contrary. Because there is no evidence that Gulf Power received any measurable benefit from the reduced chlorine content of the cover coal, the court finds that Gulf Power saved no expenses as a result its cover purchases due to the chlorine content.[16] Accordingly, the court finds that Gulf Power is entitled to a judgment against Coalsales in the amount of $20,527,789, which represents the difference between the contract price of Gulf Power's 2007 cover purchases and the price Gulf Power would have paid for the same quantity of coal under the CSA. The clerk of court is directed to enter judgment in Gulf Power's favor in that amount and close the file.[17]

**DONE and ORDERED** this 30th day of September, 2011.

s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[16] The court would also note that the majority of coal provided under the CSA was high-chlorine Galatian coal.

[17] After the court entered its findings of fact and conclusions of law, Coalsales filed a motion for attorney's fees and expenses based on a $10,000,000 Proposal for Settlement it served on Gulf Power on October 15, 2008 (doc. 176). Under Fla. Stat. § 768.79, if a defendant serves an offer of judgment that is not accepted by the plaintiff within thirty days and the judgment is one of no liability or at least twenty-five percent less than the offer, the defendant will be entitled to reasonable attorney's fees and costs incurred from the date the offer was served. Although Gulf Power did not accept Coalsales' offer, the court has determined that Gulf Power is entitled to recover $20,527,789 in damages from Coalsales. Gulf Power's damages thus exceed Coalsales' offer, and Coalsales' motion for attorney's fees and costs (doc. 176), therefore, is DENIED.

Case No. 3:06cv207/MCR/MD